[Cite as *State v. Brown*, 2016-Ohio-1358.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# LAKE COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | **O P I N I O N** |
| Plaintiff-Appellee, | : | |
| - vs - | : | **CASE NO. 2014-L-037** |
| NATHANIEL S. BROWN, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal from the Lake County Court of Common Pleas, Case No. 11 CR 000242.

Judgment: Vacated in part, reversed in part, and remanded.

*Charles E. Coulson,* Lake County Prosecutor, and *Karen A. Sheppert,* Assistant Prosecutor, Lake County Administration Building, 105 Main Street, P.O. Box 490, Painesville, OH 44077 (For Plaintiff-Appellee).

*Aaron T. Baker,* 38109 Euclid Avenue, Willoughby, OH 44094 (For Defendant-Appellant).

CYNTHIA WESTCOTT RICE, P.J.

{¶1} Appellant, Nathaniel S. Brown, appeals from the judgment of the Lake County Court of Common Pleas convicting him of murder, in violation of R.C. 2903.02(A), and gross abuse of a corpse, in violation of R.C. 2927.01(B).

{¶2} We reverse appellant's conviction for murder on several bases; first, over objection, the state's expert was permitted to present unreliable, and therefore irrelevant, technical evidence and testimony which inculpated appellant and therefore

prejudiced his defense. Further, over objection, the trial court erroneously published a copy of the transcript of appellant's interview with police for the jury to use as a "listening aid." Because there was a material difference between the transcription and an alternative, reasonable interpretation the jury could give accord a pivotal statement made by appellant during the interrogation, the trial court's decision to allow the jury to review the transcripts was an abuse of discretion resulting in prejudicial error. Finally, these errors, in conjunction with multiple other errors which occurred in the course of the jury trial, support a finding of cumulative error which violated appellant's right to a fair trial.

{¶3} We additionally vacate appellant's conviction for gross abuse of a corpse. A careful review of the evidence demonstrates the state failed to introduce sufficient evidence to prove this crime beyond a reasonable doubt. Thus, as will be discussed in greater detail below, appellant's conviction for gross abuse of a corpse is vacated, and his conviction for murder is reversed, and the matter is remanded for further proceedings.

{¶4} On Saturday, April 9, 2011, William Andrew Putzbach went to a party at his brother Erik's house with an acquaintance, Kyle Basinger. Putzbach and Basinger had a few drinks and mingled with other partygoers. Later in the evening, however, Basinger was acting strangely, following people at the party for no reason and staring blankly at others. Erik found out Basinger had identified himself as an assassin who had not yet killed anyone. Erik ultimately asked Putzbach to take Basinger home. Putzbach and Basinger subsequently left the house, to which Putzbach later returned by himself and remained overnight.

2

{¶5} On Sunday afternoon, Putzbach, accompanied by Basinger, went house-hunting with his friend, Nicole Knecht. According to Nicole, the two men were friendly and were getting along fine.

{¶6} On Sunday night, Basinger was with appellant and Ronald Shirer at appellant's and Shirer's apartment, in the Willoughby Hills Towers, playing video games. Basinger used Shirer's phone to call Putzbach to set up a marijuana deal. Surveillance cameras on the 12th floor of the apartment building captured appellant, Basinger, and Shirer walking from appellant's apartment toward an elevator. Basinger had a roll of duct tape around his right forearm.

{¶7} The three men proceeded into the parking lot of the complex, where they found Putzbach in his vehicle. All three entered the vehicle; Shirer sat in the front passenger seat, Basinger behind Putzbach, and appellant in the backseat of the passenger side. After a brief discussion, Basinger brandished a chain and looped it around Putzbach's neck. Putzbach struggled but, due to the tautness of the chain, was unable to speak. Basinger eased the pressure long enough for Putzbach to give the men his ATM personal identification number; he then reapplied the pressure. Putzbach struggled to loosen the chain, but was pulled into the rear of the vehicle. According to appellant, Basinger transferred the chain to one hand, produced a claw hammer, and repeatedly beat Putzbach in the head until he stopped moving. Basinger then bound Putzbach's hands with the tape and took his wallet and phone.

{¶8} After the incident, Basinger, with appellant in the passenger seat, left the apartment complex in Putzbach's car. Shirer followed in his vehicle. Putzbach remained in the backseat of his vehicle, bound, bleeding, and motionless. They drove

3

to Kirtland, Ohio, where Shirer filled up his gas tank using cash stolen from Putzbach. The group then drove to Willoughby Hills and they pulled into a metropark. According to appellant, Basinger stopped the vehicle and discarded various items from Putzbach's trunk. Appellant stated Basinger then moved Putzbach from the backseat to the trunk. Appellant maintained he neither assisted nor touched Putzbach's body. The men eventually returned to appellant's apartment.

{¶9} Bank records revealed that two unsuccessful attempts were made to withdraw money from Putzbach's account that night. The records further demonstrated the attempts were made from an ATM located near the Willoughby Hills Towers apartment complex.

{¶10} Over the next several days, Basinger continued to drive Putzbach's vehicle. Nichole Knecht, a friend of Putzbach who accompanied him and Basinger to look at a house on April 10, was working at Burger King on Tuesday April 12, where she witnessed Basinger, alone, driving Putzbach's vehicle. The restaurant's manager later advised Knecht that Putzbach's mother, Cathy Fayne, had visited Burger King to determine whether anyone at the establishment had seen him. Fayne indicated she could not locate Putzbach, a former employee of the restaurant, and inquired whether anyone had seen the young man. Knecht subsequently contacted Fayne. Several days later, she met with Fayne and explained she had observed Basinger driving Putzbach's vehicle. Knecht ultimately filed a police report.

{¶11} Jordan Barnes, another friend of Putzbach, also contacted police after observing Basinger driving Putzbach's vehicle. Barnes indicated he encountered

4

Basinger in the city of Euclid. He followed Basinger for some time, but ultimately lost track of the vehicle.

{¶12} After Putzbach was reported missing from work on Monday and Tuesday, April 11 and 12, a "missing-persons" investigation was initiated. Detective John Malady, of the Willowick Police Department, noted strange purchase activity relating to Putzbach's bank account, and traced certain large purchases, occurring on April 13, to the Walmart in Eastlake, Ohio. He later discovered that Putzbach's cell phone went inactive on April 11. The detective reviewed the surveillance footage from the Eastlake Walmart, which disclosed two male individuals making purchases with Putzbach's credit card. He subsequently called Erik Putzbach to determine whether he could identify either individual. Erik Putzbach identified one of the males as Basinger.

{¶13} Detective Malady retrieved Basinger's cell phone number from Fayne and left a voice message for him to contact the officer. Basinger ultimately returned the call and met with Detective Malady's partner, Detective Prochazka. Basinger told the detective the last time he saw Putzbach was on Tuesday, April 12, 2011. Basinger indicated the two spoke but did not meet. Because police knew there were no incoming or outgoing calls from Putzbach's cell phone after April 11, Basinger's statement did not match existing evidence. Arrangements were made for Basinger to meet with Detective Malady on the morning of April 17, 2011, but Basinger failed to show.

{¶14} Investigators subsequently noticed Basinger had an open Facebook account; one friend listed in the account was Ron Shirer, who Detective Malady recognized from the Walmart surveillance videos. Investigators found Shirer's last known address was his grandparent's home. After contacting Shirer's grandparents,

investigators learned Shirer did not reside at their home; the grandparents, however, described an apartment complex where Shirer had been residing in Willoughby Hills, Ohio at Willoughby Hills Towers.

{¶15} On April 18, 2011, officers went to the Willoughby Hills Towers to question Shirer regarding Basinger's and/or Putzbach's whereabouts. As they entered the complex, they immediately noticed Putzbach's 1995 Pontiac Grand Am in the parking lot. They peered inside the vehicle and observed the back seat was completely covered with a comforter; they also noticed duct tape in the vehicle's back window. Given the pending investigation, officers began to process the vehicle.

{¶16} Upon opening the vehicle's trunk, officers discovered Putzbach's beaten, bound, and bloodied body, face down. As their search progressed, officers discovered a significant amount of blood in the back seat. They also recovered a four-foot long, linked chain and a blood-stained roll of duct tape. Appellant and Shirer, who were both in their apartment, were immediately arrested and taken into custody. During a subsequent search of the apartment, officers seized a hammer of which appellant acknowledged ownership. On the same day, officers recovered Putzbach's belongings from the metropark at which they were discarded a week earlier.

{¶17} Blood-spatter analysis was conducted on the interior of Putzbach's vehicle by forensic scientist, Curtiss Jones. Jones opined that the spatters, located on the interior surface of the rear-passenger window and door, came from multiple impacts. Impact spatter was also noted on the back-vent window of the rear-passenger compartment. He further opined that the blood source was located in the rear passenger compartment at the time of the impacts. And, given the circular-to-oval

shape of the spatters, the source would have been at or near a 90-degree angle, perpendicular to that window and situated at approximately the same height of the window. Jones further opined that, based upon the size and shape of the spatter, the blood was moving from left to right toward the window.

{¶18} Dr. Stephen LaBonne, DNA technical manager at the Lake County Crime laboratory, conducted DNA testing on the hammer. The hammer tested presumptively positive for the presence of blood. After further testing, Dr. LaBonne opined the blood included a mixture of DNA. He testified, however, he could not, within a reasonable degree of scientific certainty, draw an affirmative conclusion regarding the source of the DNA. The doctor simply testified neither appellant nor Putzbach could be excluded as contributors.

{¶19} Dr. Joseph Felo, a forensic pathologist from the Cuyahoga County Medical Examiner's Office, conducted the autopsy on Putzbach's body. He noted multiple blunt force trauma injuries to Putzbach's face, head, and neck. Putzbach also had a hemorrhage over his Adam's apple caused by a squeezing of the neck that cut off blood supply to the brain. Dr. Felo determined the multiple blunt force injuries to the left side of Putzbach's scalp caused no skull fractures, but were delivered with sufficient force to cause concussion. Dr. Felo ultimately concluded that Putzbach's death was caused by a combination of cervical compression causing asphyxiation in conjunction with multiple blows to the head.

{¶20} Appellant, at all times, maintained he knew nothing of the assault and murder. During his interview with police, appellant admitted to being in the vehicle when Putzbach was murdered. He denied, however, any participation in the assault.

7

Appellant asserted Basinger did not discuss any plan to rob, let alone attack, Putzbach. Hence, he maintained, that Basinger single-handedly strangled, beat, and bound Putzbach. Appellant also stated Basinger, by himself, removed Putzbach's body from the back seat of his car to the trunk.

{¶21} On June 14, 2011, the Lake County Grand Jury indicted appellant on two counts of aggravated murder, in violation of R.C. 2903.01 (Counts One and Two); six counts of murder, in violation of R.C. 2911.01(A)(2) (Counts Three through Eight); one count of aggravated robbery, a first-degree felony, in violation of R.C. 2911.01(A)(3) (Count Nine); two counts of kidnapping, first-degree felonies, in violation of R.C. 2905.01 (Counts Ten and Eleven); two counts of felonious assault, second-degree felonies, in violation of R.C. 2903.11 (Counts Twelve and Thirteen); and one count of gross abuse of a corpse, a fifth-degree felony, in violation of R.C. 2927.01 (Count Fourteen). Appellant pleaded not guilty.

{¶22} A jury trial commenced after which appellant was found guilty on all counts. For purposes of sentencing, the trial court merged Counts Two through Eight into Count One; Count Eleven into Count Ten; and Count Thirteen into Count Twelve. Appellant was then sentenced to life imprisonment without the possibility of parole on Count One; the court further sentenced appellant to nine years imprisonment on Count Nine, nine years imprisonment on Count Ten, seven years imprisonment on Count Twelve, and 11 months imprisonment on Count Fourteen. The sentences were ordered to be served concurrently.

{¶23} Appellant appealed his convictions and, in *State v. Brown*, 11th Dist. Lake No. 2012-L-007, 2013-Ohio-1099, this court reversed appellant's convictions and

remanded the matter for a new trial based upon ineffective assistance of counsel. In particular, this court determined defense counsel rendered deficient performance in failing to object to the introduction of the portion of appellant's interview video in which the police interrogator told appellant that one of his co-defendants had implicated him in the incident. The statement served as a "circumstantial accusation" that appellant was involved in the crimes despite his regular and continued protestations of innocence. The admission of the statement permitted the jury to premise its verdict upon the incriminating, yet potentially unreliable, extrajudicial statement ascribed to the co-defendant without appellant having the opportunity to test him in the crucible of cross-examination. Because of the substantial risk that the jury relied upon the inculpatory statement in arriving at its verdict, the admission of the statement violated defendant's right to confrontation secured by the Sixth Amendment under *Bruton v. United States*, 391 U.S. 123 (1968). This court accordingly held appellant suffered prejudice. The state sought discretionary review from the Ohio Supreme Court. The Court, however, denied the discretionary appeal. *See State v. Brown*, 136 Ohio St.3d 1473, 2013-Ohio-3790.

{¶24} The matter was subsequently retried. During the second trial, additional witnesses were called by the state, including Kyle Basinger and Choya Hawn, an accident reconstruction expert. Prior to retrial, a *Daubert* hearing was held regarding Hawn's status as an expert. At the hearing, Hawn noted he was retained to utilize evidence obtained from law enforcement as well as the medical examiner's office to draw the vehicle and its occupants to scale in order to recreate a three-dimensional model of the crime scene. From these independent sources, Hawn was asked to

9

provide an opinion regarding which person in the vehicle, more likely than not, swung the hammer. Hawn concluded this individual, in his opinion, was sitting in the rear, passenger-side seat. Hawn was subsequently permitted to testify to his methods, procedures, findings, and conclusion.

{¶25} At retrial, Basinger testified appellant volunteered to pay $20 for marijuana if Basinger could acquire it. Basinger asserted he called Putzbach, who indicated he had marijuana to sell. While they waited, Basinger stated he obtained the hammer, the chain, and duct tape from the apartment. He asserted, however, he did not disclose he had these items nor did he discuss any plan to rob or assault Putzbach with Shirer or appellant. Instead, Basinger stated the three men only discussed meeting with Putzbach together in order to inspect the marijuana.

{¶26} Once Putzbach arrived, the three men exited the building and entered his vehicle. Basinger stated he then wrapped the chain around Putzbach's neck, ultimately pulling him halfway into the back seat. Basinger noted, appellant, who was located in the rear passenger seat, was "freaking out." Basinger testified he then grabbed the hammer and started beating Putzbach. According to Basinger, all the while, appellant remained cowering in his seat as Basinger strangled and bludgeoned Putzbach. Basinger further testified he alone removed Putzbach from the vehicle and placed his lifeless body in the trunk.

{¶27} The state moved to have Basinger declared a Court's Witness due to the surprise occasioned by his testimony. According to the prosecutor, Basinger had, on several previous occasions, provided statements implicating appellant as the individual who beat Putzbach with the hammer. In his initial statements to police, Basinger

10

inculpated appellant and, prior to trial, he made a similar statement to the prosecutor. The court granted the state's request.

{¶28} In response to the state's inquiries regarding Basinger's previous statements, he advised the prosecutor, during his interviews with police, he was "in another world," "under the influence of LSD, pot, coke, you name it I was on it." He further testified he implicated appellant for selfish reasons, "but it was a lie." Basinger explained his initial statements were based upon his understanding that appellant "snitched" on him. At the time of retrial, however, he felt it was his "civic duty" to "tell you guys exactly the truth." In Basinger's view, the only way he would have the opportunity was to testify to what he identified as "the truth" was to accept the state's invitation to provide testimony during the retrial. On several occasions during his testimony, Basinger stated appellant was not involved in any part of the incident, including the removal of the body.

{¶29} The jury received the matter for deliberation on February 14, 2014; on February 21, 2014, the jury returned a verdict of guilty on one count of murder, in violation of R.C. 2903.02(A) and a verdict of guilty on the gross abuse of a corpse charge, in violation of R.C. 2927.01(B). Appellant was acquitted on all other counts. Appellant was sentenced to a term of 15 years to life on the murder conviction and one year on the gross abuse of a corpse conviction. The trial court ordered the terms to be served consecutively. Appellant now appeals and assigns 15 errors for this court's review. Appellant's assignments of error shall be considered out of order.

{¶30} We shall first address appellant's sixth assignment of error. It provides:

11

**{¶31}** "The trial court engaged in error, plain and otherwise, when it permitted the state's investigating officers to testify to opinions of guilt without any basis."

**{¶32}** Under this assigned error, appellant argues investigating officers Patrolman David Broadwater and Detective Ron Parmertor improperly testified concerning appellant's credibility and veracity.

**{¶33}** Opinion testimony from a police officer relating to an accused's veracity is not admissible. *State v. Withrow*, 11th Dist. Ashtabula No. 2011-A-0067, 2012-Ohio-4887, ¶47. A jury tends to trust a police officer's perceptions, similar to that of an expert witness. *State v. Root*, 11th Dist. Ashtabula No. 2003-A-0043, 2004-Ohio-2439, ¶31. As a result, such testimony infringes upon the fact-finding function of the jury and affects the fundamental fairness of the trial.

**{¶34}** "[A] trial court is vested with broad discretion in determining the admissibility of evidence in any particular case, so long as such discretion is exercised in line with the rules of procedure and evidence." *Rigby v. Lake Cty.*, 58 Ohio St.3d 269, 271 (1991). "Where defense counsel fails to object at trial, the admission of testimony must constitute plain error, defined as error that is obvious and outcome-determinative, to justify reversing the judgment or conviction." *State v. Bowden*, 11th Dist. Ashtabula No. 2013-A-0040, 2014-Ohio-158, ¶41, citing *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, ¶108; Crim.R. 52(B) ("[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court").

**{¶35}** Even though opinion testimony regarding the truthfulness of a witness is inadmissible, a witness may give "testimony in the form of opinions or inferences * * * which are (1) rationally based on the perception of the witness and (2) helpful to a clear

12

understanding of the witness' testimony or the determination of a fact in issue." Evid.R. 701; *see also Bowden*, *supra*, at ¶44.

{¶36} Under this assignment of error, appellant identifies various times Patrolman Broadwater improperly commented on appellant's body language, hesitation in speech, and contradictions during his interrogation. Appellant further asserts Broadwater inappropriately commented on his truthfulness during the course of the interrogation. Similarly, appellant argues he was prejudiced when Detective Parmertor was allowed to testify to his interpretation of a statement made by appellant during the interrogation that arguably inculpated him in the incident. He further asserts Parmertor improperly testified that, throughout the investigation, he believed appellant assisted Basinger in Putzbach's murder. We shall address each issue in turn.

{¶37} Appellant first points to Patrolman Broadwater's comment that, during the interrogation, appellant's facial expression demonstrated appellant's awareness of his own untruthfulness. Defense counsel immediately objected to Broadwater's speculative opinion and the trial court sustained the same. The trial court, at the end of the trial, cautioned the jury that it must not consider any testimony that was premised upon a sustained objection. Accordingly, even though Broadwater's observation about appellant's alleged consciousness of his own untruthfulness was improper, it was not admitted. We accordingly perceive no error.

{¶38} Next, appellant asserts the trial court erred in failing to sustain an objection when Broadwater highlighted appellant's use of the past tense in referring to his future plans. When the officer asked appellant about his intentions for the future, he

13

stated he "was" going into the army. Broadwater noted he thought it was "interesting" appellant used the past tense "was," rather than the present tense "am."

{¶39} Broadwater's testimony in this instance was not a comment on appellant's veracity. Rather, he was pointing out a feature of appellant's word choice that might assist the jury in evaluating appellant's credibility. Broadwater's observation was both rationally based on his perception of appellant and helpful to a clear understanding of what appellant actually said during the interrogation. Again, we discern no error.

{¶40} Appellant further identifies multiple situations during which Broadwater commented on appellant's demeanor or voice tone. First, Broadwater noted that appellant paused and changed his tone once he was told investigators had surveillance videos. In Broadwater's estimation, the long pauses "appear[ed] to [him] that [appellant was] giving up." Broadwater further asserted appellant's body language indicated he was protecting himself by crossing his arms and placing his hand in front of his mouth. In the officer's view, these behaviors also suggested appellant was having difficulty formulating his thoughts and reflected an attitude that he was considered as guilty as Basinger. Finally, Broadwater testified that, near the end of the interrogation, appellant's general demeanor suggested he was "giving up," as though he had "no hope."

{¶41} None of the foregoing comments or observations indicate appellant was being untruthful during the interrogation. Instead these comments are merely descriptive of Broadwater's impressions of appellant during the progression of the interrogation. Clearly, Patrolman Broadwater did not have access to appellant's inner thoughts. Nevertheless, he was describing appellant's behavior and offering an opinion

14

on, from his vantage point as an interrogator, the meaning of these behaviors. While these opinions are speculative, they do not represent a challenge to appellant's credibility or his truthfulness. The comments were rationally based upon the officer's perception of appellant and helpful to understanding his testimony regarding appellant's statements and gestures.

{¶42} Moreover, on cross-examination, defense counsel emphasized that Broadwater's impressions of appellant's demeanor were not inferentially necessary; in other words, Broadwater admitted appellant's behavior, including his hesitations and body language, did not inherently suggest anything other than he was nervous and uncomfortable, perfectly reasonable reactions that would be equally consistent with appellant's protestations of innocence. Accordingly, we find no error in the admission of Patrolman Broadwater's foregoing testimony.

{¶43} Appellant next argues plain error occurred when Patrolman Broadwater was permitted to testify as to his belief that appellant was lying during the interrogation.

{¶44} On redirect examination, Broadwater testified that appellant was lying during the interrogation because, according to the officer's belief, appellant used the hammer. Defense counsel did not object to this testimony. We agree that Broadwater's statement was objectionable and prima facie inadmissible. We do not, however, find plain error.

{¶45} Throughout Broadwater's testimony, he details how appellant's story gradually changed during the interrogation. Initially, appellant maintains he did not witness the murder and had no idea what occurred prior to or during the attack. By the end of the interrogation, appellant admitted to witnessing the entirety of the attack.

15

During cross-examination, defense counsel asked Broadwater "at the beginning of the interview, you're pretty convinced that [appellant is] lying to you, right?" Broadwater responded directly, "Very early in the interview I believe he is." This statement regarding appellant's truthfulness relates to appellant's initial position that he was neither present nor witnessed the assault. This was not a startling revelation as appellant testified that he initially lied to police to protect himself. Defense counsel, however, used this line of questioning to establish that it is not uncommon for a person-of-interest to deny witnessing a crime, but such a denial does not suggest the individual was involved in the crime under investigation.

{¶46} On re-direct, however, the following exchange occurred between Broadwater and the prosecutor:

> {¶47} Q. Now, [defense counsel] also asked you about the fact that, I think he played that clip for us, showing about demonstrating about the chain and what Kyle Basinger was doing at that point in time, and I think he asked you if you thought he was telling [the] truth about that and I believe you indicated partially; is that correct?
>
> {¶48} A. Yes.
>
> {¶49} Q. And why did you think he was only telling the partial truth at that time?
>
> {¶50} A. He was omitting the part that where the hammer was used.
>
> {¶51} Q. So, can you explain to us in a little more detail what you mean by that?
>
> {¶52} A. Well, he made the statement that Kyle just choked the life out of the dude and left it at that. And then the question was asked was there any other instrument used, long pause, there was a hammer.
>
> {¶53} Q. And what was the significance of the pause?
>
> {¶54} A. He was lying, because to me I believed he's leaving it out because he's using a hammer.

16

{¶55} Although defense counsel did not object to Patrolman Broadwater's comment on appellant's veracity, on re-cross, counsel addressed the foregoing points.

{¶56} Q. The Prosecutor just asked you about the long pause before he's talking about the hammer, and you said it's because he's lying. That's what you just said?

{¶57} A. I believe so, yes. I did say that.

{¶58} Q. But you didn't ask him who had the hammer? You asked him if there was another instrument; isn't that correct?

{¶59} A. Correct.

{¶60} Q. So, that was the question he was answering?

{¶61} A. Yes, sir.

{¶62} Defense counsel proceeded to underscore, and Broadwater agreed, that appellant's presence at the police station for a lengthy interview, given the surrounding circumstances, would have made appellant hesitant and nervous.

{¶63} We agree that Broadwater's comment on appellant's credibility, which was elicited by the prosecutor, was improper. The specific nuances of cross-examination and re-cross demonstrate, however, that defense counsel utilized these points to undermine the officer's testimony by discussing his belief that appellant was being deceitful. In the course of questioning Broadwater, defense counsel was able to establish that the officer's preconceptions relating to appellant's gestures, body language, and even appellant's changed story could be benignly explained away and were in no way necessarily indicative of appellant's guilt. Given the angle, theme, and content of defense counsel's examination, we cannot say that the officer's comment on appellant's veracity, unto itself, is plain error.

17

{¶64} Appellant next argues he was unfairly prejudiced by Detective Parmertor's testimony that appellant, during the course of the interrogation, implicated himself in the attack. During the interrogation, appellant recounted the incident and, according to Parmertor, when describing how the victim ended up in the back of the vehicle, appellant purportedly asserted "*we* pulled him back." According to appellant, the recording of the interrogation indicates he stated "*when he* pulled him back." No objection was made to this testimony. Appellant maintains, however, the detective's interpretation was erroneous and improperly influenced the jury.

{¶65} The video of the interrogation was played for the jury. And, although Parmertor testified that appellant, in fact, used the pronoun "we" rather than the phrase "when he," defense counsel underscored the general lack of clarity in appellant's verbiage on cross-examination. The jury was presented with each competing interpretation of appellant's statement; the jury was further able to assess the recording and draw its own conclusion. Parmertor's interpretation reflects his rational impression of appellant's statement and was arguably helpful to a clear understanding of his testimony. Evid.R. 701. In short, the testimony appellant challenges involves an issue of weight, not admissibility. We find no plain error.

{¶66} Appellant next argues that he suffered unfair prejudice when Parmertor testified, without objection, that it was his belief that appellant had assisted in the murder. Parmertor's "belief" relating to appellant's guilt reflects his personal assessment of appellant's credibility. As discussed above, such testimony is improper. Although this testimony was error, unto itself, we find no plain error.

18

{¶67} Detective Parmertor's "belief" was premised upon his observations of appellant's demeanor and statements during the interrogation. Parmertor stated appellant, in his estimation, showed no remorse relating to the crime or for the victim. In Parmertor's view, he only appeared concerned with himself. Moreover, even though he indicated Basinger warned him not to say anything about the attack, he did not notify police. And Parmertor testified appellant did not state he feared Basinger. These points, in conjunction with the patent fact that appellant's story evolved several times from the commencement of the interrogation until its conclusion, demonstrate that Parmertor's "belief" could be reasonably grounded in his perception of appellant during the interrogation and was helpful to a clear understanding of what the officer perceived. Although the testimony was error, we cannot conclude this statement, standing alone, was plain error.

{¶68} Appellant's sixth assignment of error is without merit.

{¶69} Appellant's seventh assignment of error provides:

{¶70} "The trial court erred when it inexplicably instructed the jury that it should weigh Basinger's testimony with 'grave suspicion,' despite the fact that he did not testify against appellant, but rather exonerated him, offering only exculpatory testimony, which deprived appellant of due process and a fair trial."

{¶71} An appellate court reviews a trial court's decision to provide a jury a particular set of jury instructions for an abuse of discretion. *State v. Barker*, 11th Dist. Portage No. 2010-P-0044, 2012-Ohio-522, ¶91. "If, however, the jury instructions incorrectly state the law, then an appellate court will conduct a de novo review to

19

determine whether the incorrect jury instruction probably mislead the jury in a matter materially affecting the complaining party's substantial rights." *Id.*

{¶72} R.C. 2923.03(D) provides:

{¶73} If an alleged accomplice of the defendant testifies *against the defendant* in a case in which the defendant is charged with complicity in the commission of or an attempt to commit an offense, an attempt to commit an offense, or an offense, the court, when it charges the jury, shall state substantially the following:

{¶74} The testimony of an accomplice does not become inadmissible because of his complicity, moral turpitude, or self-interest, but the admitted or claimed complicity of a witness may affect his credibility and make his testimony subject to grave suspicion, and require that it be weighed with great caution.

{¶75} It is for you, as jurors, in the light of all the facts presented to you from the witness stand, to evaluate such testimony and to determine its quality and worth or its lack of quality and worth. (Emphasis added.)

{¶76} The trial court instructed the jury as follows:

{¶77} You have heard testimony from Kyle Basinger, another person who pleaded guilty of the same charges in this case and is said to be an accomplice. An accomplice is one who purposely or knowingly assists or joins another in the commission of a crime. Whether Kyle Basinger was an accomplice and the weight to give his testimony are matters for you to determine from all the facts and circumstances in evidence.

{¶78} The testimony of an accomplice does not become inadmissible because of his complicity, moral turpitude, or self interest, but the admitted or claimed complicity of a witness may affect his credibility and make his testimony subject to grave suspicion, and require that it be weighed with great caution.

{¶79} It is for you, as jurors, in the light of all the facts presented to you and from the witness stand, to evaluate such testimony and to determine its quality and worth or its lack of quality and worth.

{¶80} An accomplice may have special motives in testifying, and you should carefully examine an accomplice's testimony and use it with great caution and view it with grave suspicion.

20

**{¶81}** No objection was made to the foregoing instruction. Crim.R. 30(A) provides: "On appeal, a party may not assign as error the giving or the failure to give any instructions unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection." As previously noted, however, pursuant to Crim.R. 52(B), this court may recognize plain error or defects involving substantial rights even though they are not brought to the attention of the trial court. *State v. Moreland*, 50 Ohio St.3d 58, 62 (1990).

**{¶82}** Appellant asserts that the trial court erred in giving the above instruction in this case because Basinger testified in favor of the defense, rather than the State. He maintains that by giving the instruction, the trial court improperly commented on Basinger's credibility and therefore violated his right to a fair trial.

**{¶83}** In response, the state argues there was no error in the court's issuance of the statutory instruction because doing so was consistent with the legislative intent of the statute. The state cites *State v. Ramsey*, 8th Dist. Cuyahoga No. 83026, 2004-Ohio-3618, in support of its proposition.

**{¶84}** In *Ramsey*, a co-defendant entered a plea agreement with the state wherein he agreed to testify against the appellant in exchange for the state dropping his death penalty specification. The co-defendant agreed to testify at the appellant's trial, but, when called, denied he and the appellant committed robbery or murder. Over defense counsel's objection, the trial court instructed the jury pursuant to R.C. 2923.03(D). On appeal, the appellant argued the instruction was error because the co-defendant testified in favor of the defense. The Eighth Appellate District disagreed, holding:

**{¶85}** We reject [the appellant's] contention that the statute applies only when an accomplice testifies for the State. The legislative intent of the statute "is to warn juries of the motivations that accompany accomplice testimony in a strong and uniform manner." *State v. Williams*, 117 Ohio App.3d 488, 495 (1st Dist.1996). In short, the policy behind the practice of so instructing the jury is to alert the jury to the possibility of perjured testimony. *United States v. Nolte*, 440 F.2d 1124, 1126 ([5th Cir.] 1971). "When an accomplice testifies for the prosecution he may have an interest in prevaricating in favor of the prosecution to obtain favors or even immunity. On the other hand, when one accomplice testifies for another, there is always the chance that each will try to 'swear the other out of the charge.'" *Id.*, citing *Washington v. Texas*, 388 U.S. 14, 21-23 (1967). Thus, the charge should be given whether the accomplice testifies for the defense or the prosecution. *Ramsey*, *supra*, at ¶49.

**{¶86}** We appreciate appellant's argument, particularly in light of the substance of Basinger's testimony. Nevertheless, and even though he was declared a court's witness, Basinger was called to testify by the state. Under the circumstances, therefore, we conclude the trial court did not err in giving the instruction.

**{¶87}** We recognize that it is not entirely obvious how Basinger's exoneration of appellant could be reasonably premised upon suspicious motivations or any interest (set forth on record) of "swearing" appellant out of the charge. Basinger entered a plea of guilty to aggravated murder and was sentenced to life in prison without the possibility of parole. He stood to gain nothing from his testimony. Furthermore, the facts of this case indicate appellant and Basinger were, at best, acquaintances who had no direct contact with one another since the night of the incident.

**{¶88}** Moreover, the state aggressively impeached Basinger's testimony, calling the jury's attention to several previous statements in which he implicated appellant as the individual wielding the hammer. Although Basinger explained his reasons for "lying" in his previous statements, the state emphasized that Basinger's credibility was

22

suspect. Given the circumstances of this case, we hold the jury instruction was not improper.

**{¶89}** Appellant's seventh assignment of error is without merit.

**{¶90}** Appellant's eighth assignment of error provides:

**{¶91}** "The trial court failed to instruct the jury accurately as to the mens rea of 'purposely' required for complicity to the crime of murder, which deprived appellant of due process and a fair trial."

**{¶92}** Under his eighth assignment of error, appellant asserts the trial court erred in issuing its jury instructions on complicity. He argues the trial court's failure to specifically and unequivocally define the mens rea necessary for complicity in its complicity instruction rendered the instructions deficient. He additionally contends the error was compounded by the state's closing argument in which the prosecutor defined complicity using a "knowingly" mental state rather than the correct "purposely" mental state.

**{¶93}** Defense counsel did not object to this instruction; accordingly, appellant has forfeited all but plain error. *See State v. Head*, 11th Dist. Lake No. 2001-L-228, 2005-Ohio-3407, ¶17.

**{¶94}** In issuing its jury instructions, the trial court advised the jury that "[b]efore you can find the Defendant guilty of murder, you must find beyond a reasonable doubt that on or between April 10 and April 11, 2011, in Lake County, Ohio, the Defendant purposely caused the death of William A. Putzbach." The court further instructed the jury that:

> **{¶95}** [a] person acts purposely when it is his specific intention to cause a certain result. * * *

23

{¶96} Purpose is a decision of the mind to do an act with a conscious objective of producing [a] specific result or engaging in specific conduct. To do an act purposely is to do it intentionally and no[t] accident[a]l[l]y. Purpose and intent mean the same thing. The purpose with which a person does an act is known only to himself unless he expresses it to others or indicates it by his conduct.

{¶97} The purpose with which a person does an act or brings about a result is determined from the manner in which it is done, the means or weapons used, and all the other facts and circumstances in evidence.

{¶98} If a wound is inflicted upon a person with a deadly weapon in a manner calculated to destroy life, the purpose to cause the death may be, but is not required to be, inferred from the use of the weapon. The inference, if made, is not conclusive.

{¶99} The trial court went on to instruct the jury on complicity as follows:

{¶100} In considering the charges, consider a concept called complicity in addition to the instructions I have previously given you.

{¶101} A person who purposely, knowingly, or recklessly (depending on the offense) solicits procures, aids or abets, conspires, helps, assists, strengthens, encourages, or incites another; or directs or associates himself with another in the commission of a crime or for the purpose of committing a crime, is regarded as if he were the principal offender, and is just as guilty as if he personally performed every act constituting the offense.

{¶102} I have previously defined purposely, knowingly, and recklessly * * *. You are to use those definitions here.

{¶103} Appellant argues the complicity instruction was improper and misleading because it did not specifically and independently state that, to be complicit to murder, the jury had to find he acted purposely. Appellant's argument is without merit.

{¶104} Although appellant was convicted of complicity to murder, it was not the only crime with which he was charged. He was also charged with, inter alia, several additional counts of murder, one of which alleged the crime occurred as a proximate result of committing or attempting to commit felonious assault, which requires a

24

*knowingly* mens rea; appellant was additionally charged with aggravated robbery, which required the state to prove he, while committing or attempting to commit a theft, *recklessly* inflicted or attempted to inflict serious physical harm. Accordingly, the complicity instruction did not invite the jury to conclude the mental state necessary for a murder conviction was lower than purposely; instead, it was a general instruction that addressed each count to which appellant could be found complicit; and some of these counts required proof that appellant either acted knowingly or recklessly. The instruction accounted for this point by specifying that the relative culpable mental state would be dependent upon the offense to which the jury applied the complicity definition. This court has addressed a similar issue in *Head*, *supra*.

{¶105} In *Head*, this court determined that a trial court's complicity instruction was proper even though it did not individually specify the mens rea for the crimes of which the defendant was convicted. The facts of *Head* were slightly different from the matter sub judice. Unlike this case, where the court inserted each culpable mental state in the complicity instruction, the trial court in *Head* thoroughly stated the law regarding complicity, but did not insert a culpable mental state into the instruction. The court, however, reminded the jury that all terms previously defined in the instructions retained their original definition.

{¶106} On appeal of the trial court's complicity instruction, this court determined the instruction was sufficient to the extent the trial court had previously set forth the requisite culpable mental states for each crime the defendant was convicted and wholly incorporated those definitions. *Id.* at ¶30; *see also State v. Dykes*, 11th Dist. Lake No. 92-L-078, 1993 Ohio App. LEXIS 6082, *21-22 (Dec. 17, 1993) (complicity instruction

25

did not refer specifically to the requisite, culpable mental state, the instructions for both underlying offenses included the requisite, culpable mental state instructions. Thus, the defendant was not prejudiced and the jury instructions accurately stated the law.)

{¶107} Here, the trial court fully defined each crime with which appellant was charged, which included a definition of each culpable mental state for the respective crimes. It furthermore reminded the jury that it had previously defined the various mens rea levels and the jury was to apply those definitions "depending on the offense." We therefore hold the instructions given by the trial court accurately set forth the law and, as a result, we perceive no error in the trial court's administration of this aspect of the complicity instruction.

{¶108} Appellant next claims that because the prosecutor erroneously used the mental state "knowingly" in discussing complicity to murder in its closing rather than "purposely," he suffered prejudice. "The test regarding prosecutorial misconduct in closing arguments is whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant." *State v. Smith*, 14 Ohio St.3d 13 (1984). Clearly, the state's remark was improper; the trial court, however, instructed the jury that neither party's opening statements or closing arguments were evidence to be considered in deliberations. Because the trial court assigned the proper mens rea to the crime of murder in its jury charge and the complicity instruction was accurate, we hold the prosecutor's remark did not affect appellant's substantial rights.

{¶109} Appellant's eighth assignment of error lacks merit.

{¶110} We shall next address appellant's tenth assignment of error, which alleges:

26

**{¶111}** "The trial court engaged in an abuse of discretion when it provided a transcript, complete with the court reporter's certification of appellant's interrogation to the jury, despite absolute disagreement between the parties as to the most material portion of the recording, was a denial of appellant's right to confront witnesses." [Sic.]

**{¶112}** Appellant contends the court reporter's certification was a testimonial, hearsay statement. Because he was not given the opportunity to cross-examine the court reporter, he was denied his right to confrontation.

**{¶113}** The Confrontation Clause prohibits the admission or use of testimonial statements of a witness who does not appear at trial unless that witness is unavailable to testify, and the defendant has had a prior opportunity for cross-examination. *Crawford v. Washington*, 541 U.S. 36, 68 (2004). The Sixth Amendment right to confrontation, however, may only be invoked under situations where hearsay is offered into evidence. *Id.* at 60, n. 9.

**{¶114}** "Hearsay" involves "a statement, other than one made by the declarant while testifying at the trial or hearing, *offered in evidence* to prove the truth of the matter asserted." The court issued multiple instructions that the transcript was *not* evidence. To the extent the transcript was not evidence, the transcript, along with the certification, was not hearsay. Thus, appellant's right to confront was not triggered.

**{¶115}** Appellant's tenth assignment of error is without merit.

**{¶116}** Appellant's eleventh assignment of error provides:

**{¶117}** "The trial court erred in failing to instruct the jury as to the lesser included offense of involuntary manslaughter."

27

{¶118} Under this assigned error, appellant argues the trial court erred by failing to instruct the jury on the lesser included offense of involuntary manslaughter. Appellant notes he was charged with not just purposeful murder, but also, inter alia, aggravated murder in the course of kidnapping and aggravated robbery. The aggravated murder counts alleged appellant purposely caused the death of Putzbach while committing the foregoing felonies.

{¶119} With respect to the kidnapping element of one aggravated murder count, the state theorized appellant, with Basinger's assistance, removed Putzbach from the driver's seat and restrained his liberty in the course of the attack. Regarding the aggravated robbery element of the other aggravated murder count, the state alleged appellant, with Basinger and Shirer, planned to rob Putzbach and, in the course of executing this plan, inflicted serious physical harm. Accordingly, appellant maintains, under any reasonable view of the evidence, the trial court should have instructed the jury to consider whether appellant caused Putzbach's death, not simply purposely, but as a proximate result of the commission of kidnapping and robbery; in short, appellant contends the jury could have acquitted him of purposeful aggravated murder, and found him guilty of involuntary manslaughter, a lesser included offense of each aggravated murder count. Hence, he maintains, the trial court committed plain error.

{¶120} The Supreme Court of Ohio has held "a charge on such lesser included offense is required only where the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction upon the lesser included offense." *State v. Thomas*, 40 Ohio St.3d 213 (1988), paragraph two of the syllabus. If

28

this test is met, the court *must* give the instruction. *State v. Shane*, 63 Ohio St.3d 630, 632 (1992).

{¶121} In construing the evidence, the Supreme Court of Ohio has further held that a trial court may not engage in a weighing exercise. In *State v. Wilkins*, 64 Ohio St.2d 382 (1980), the Court concluded:

{¶122} The persuasiveness of the evidence regarding the lesser included offense is irrelevant. If under any reasonable view of the evidence it is *possible* for the trier of fact to find the defendant not guilty of the greater offense and guilty of the lesser offense, the instruction on the lesser included offense must be given. The evidence *must* be considered in the light most favorable to [the] defendant. (Emphasis added.) *Id.* at 388; *see also Shane, supra*, at 637.

{¶123} Preliminarily, appellant argues we review the trial court's failure to instruct the jury on involuntary manslaughter for an abuse of discretion. In support, he cites *State v. Wine*, 140 Ohio St.3d 409, 2014-Ohio-3948. In *Wine*, the trial court gave a lesser-included-offense instruction over the defendant's objection. The defendant claimed his "all-or-nothing" defense was trial strategy and thus the trial court erred in issuing the instruction. The Supreme Court disagreed, holding: "[A] criminal defendant does not have the right to prevent a trial court from giving lesser-included-offense jury instructions; whether to include such jury instructions lies within the discretion of the trial court and depends on whether the evidence presented could reasonably support a jury finding of guilt on a particular charge." *Id.* at ¶1.

{¶124} In this case, there was no objection and, even though appellant employed an "all-or-nothing" defense, the court did not provide the jury with the instruction. Hence, we review this assignment for plain error under Crim.R. 52(B). "To rise to the level of plain error, it must appear on the face of the record not only that the error was

29

committed, but that except for the error, the result of the trial clearly would have been otherwise." *State v. Bock*, 16 Ohio App.3d 146, 150 (12th Dist.1984).

**{¶125}** Appellant first contends involuntary manslaughter is a lesser included offense to purposeful murder. We do not agree with this argument.

**{¶126}** "An offense may be a lesser included offense of another if (i) the offense carries a lesser penalty than the other; (ii) the greater offense cannot * * * ever be committed without the lesser offense * * * also being committed; and (iii) some element of the greater offense is not required to prove the commission of the lesser offense." *State v. Deem*, 40 Ohio St.3d 205 (1988), paragraph three of the syllabus.

**{¶127}** Clearly, involuntary manslaughter is "of lesser degree" than murder and carries a lesser penalty; it is a felony of either the first degree or the third degree, depending on whether the underlying offense is a felony or a misdemeanor. *See* R.C. 2903.04(C). Alternatively, murder is a greater offense because its penalty (imprisonment of fifteen years to life) is more severe than that imposed on all felonies except aggravated murder. Thus, requirement (i) is met. The essential element of "purpose" in murder is not required to prove the commission of involuntary manslaughter, thus fulfilling requirement (iii). It does not appear, however, that the offense of purposeful murder cannot be committed without committing involuntary manslaughter, as mandated by requirement (ii).

**{¶128}** Pursuant to R.C. 2903.02, murder is purposely causing the death of another. Involuntary manslaughter, as defined in R.C. 2903.04, involves causing the death of another as "the proximate result of the offender's committing or attempting to commit" a felony. Involuntary manslaughter has an element not found in murder; namely

the proximate causation stemming from the commission of a felony offense. *See State v. Fee*, 1st Dist. Hamilton No. B-814243, 1984 Ohio App. LEXIS 11579, *8-*9 (Nov. 21, 1984). Accordingly, purposeful murder can be committed without committing involuntary manslaughter and thus it fails to meet the second requirement of the *Deem* test.

{¶129} Nevertheless, appellant was charged with aggravated felony murder, pursuant to R.C. 2903.01(B). R.C. 2903.01(B) provides, in relevant part: "No person shall purposely cause the death of another * * * while committing or attempting to commit * * * kidnapping* * *." Involuntary manslaughter, under R.C. 2903.04, is a lesser included offense of aggravated murder, R.C 2903.01(B). *State v. Lynch*, 98 Ohio St.3d 514, 2003-Ohio-2284, ¶79. The primary difference between these two offenses is aggravated felony murder requires a purpose to kill, while involuntary manslaughter requires only that the killing occur as a proximate result of committing or attempting to commit a felony. *See State v. Jenkins*, 15 Ohio St.3d 164, 218 (1984). In either case, however, a death occurs as a result of a defendant's commission or attempted commission of a felony.

{¶130} The evidence in this case reasonably supports an acquittal on an aggravated murder charge and a conviction on involuntary manslaughter. If the jury believed appellant did not implicate himself during the interrogation, this would support an acquittal on purposeful aggravated murder while committing a felony, i.e., whether kidnapping or aggravated robbery.

{¶131} Alternatively, Putzbach's death was a result of a combination of strangulation *and* blunt-force trauma. With this in mind, if the jury believed appellant implicated himself in his statement, but did not believe he wielded the hammer, it could

31

reasonably find that Putzbach's death was a proximate result of appellant assisting in the commission of either kidnapping or aggravated robbery. Thus, the evidence would support a conviction on involuntary manslaughter, the lesser included offense of aggravated felony murder. We therefore hold the trial court erred in failing to instruct the jury on this lesser included offense.

{¶132} Notwithstanding this conclusion, appellant was acquitted on the aggravated felony murder charge; accordingly, appellant suffered no prejudice from the court's failure to instruct the jury on involuntary manslaughter, the lesser included offense of the acquitted charge. Any error was therefore harmless.

{¶133} Appellant's eleventh assignment of error is without merit.

{¶134} Appellant's twelfth assignment of error provides:

{¶135} "The trial court erred in permitting Dr. Joseph Felo to testify to opinions not contained in his report, in violation of Crim.R. 16."

{¶136} Under this assignment of error, appellant argues the trial court abused its discretion when it permitted the coroner, Dr. Felo, to testify as to his opinion regarding the handedness of the individual who struck the victim, based upon the victim's injuries. Appellant contends the opinion was not part of Felo's report and, despite discovery demands, was never disclosed prior to trial. He therefore concludes he suffered material prejudice when the trial court failed to sustain his objection to the testimony.

{¶137} Evidentiary rulings are matters within the discretion of the trial court, and will not be disturbed save a clear abuse of that discretion whereby the defendant has suffered material prejudice. *State v. Bennett,* 11th Dist. Ashtabula No. 2002-A-0020, 2005-Ohio-1567, ¶39.

{¶138} Crim.R. 16(K) governs expert witnesses and their reports. It provides, in relevant part: "An expert witness for either side shall prepare a written report summarizing the expert witness's testimony, findings, analysis, conclusions, or opinion, and shall include a summary of the expert's qualifications." Appellant argues that because Felo's opinion regarding handedness was never disclosed in his written report, the testimony violated Crim.R. 16(K).

{¶139} The state emphasizes that Crim.R. 16(K) requires an expert to provide a report *summarizing* the expert's testimony, findings, analysis, conclusions, or opinions. The state maintains requiring detailed information on an expert's opinion, e.g., Felo's opinion on the handedness of the attacker, would impose an onerous burden on an expert. We do not agree with the state's view.

{¶140} We recognize that the rule merely requires a summary; but, if Felo was going to provide an *opinion* on the handedness of the attacker wielding the hammer, the report should have included a brief summary of that opinion. This would place defense counsel on notice of this substantive opinion testimony and permit counsel the option and opportunity to obtain a second opinion on this issue. In this respect, we agree with appellant that the objection should have been sustained. Notwithstanding this error, however, we fail to see how the inclusion of Felo's testimony created material prejudice.

{¶141} A review of the facts demonstrates that the handedness of the individual striking Putzbach with a hammer is of marginal value. First of all, Parmertor testified that both Basinger and appellant are right-handed. Accordingly, the statement neither tended to implicate nor exculpate either individual.

{¶142} Furthermore, the hammer was used to strike a relatively large object within the small confines of the vehicle's back seat. Whether a person is right-handed or left-handed, therefore, is of little probative value to the extent that an individual could strike the object in question with reasonable accuracy and force even if the hammer was swung with one's non-dominant hand. We therefore find any error in admitting the testimony harmless.

{¶143} Appellant's twelfth assignment of error is without merit.

{¶144} Appellant's thirteenth assignment of error provides:

{¶145} "The trial court committed error, allowing prosecutorial misconduct, during closing argument."

{¶146} Appellant challenges several statements made by the state during closing. Defense counsel, however, did not object to these statements. Hence, we shall consider appellant's arguments and determine whether the statements rise to plain error.

{¶147} As indicated above, "[t]he test for prosecutorial misconduct is whether remarks were improper and, if so, whether they prejudicially affected substantial rights of the accused." *State v. Smith*, 87 Ohio St.3d 424, 442 (2000). The focus "is the fairness of the trial, not the culpability of the prosecutor." *Id.* Thus, prosecutorial misconduct is not a basis for reversal unless it so taints the proceedings that a defendant is deprived of a fair trial. *Id.*

{¶148} First, appellant asserts the prosecutor committed misconduct by stating appellant was complicit "before, during, *and after* all these crimes[.]" (Emphasis added.) And the prosecutor subsequently observed: "How is he complicit after? Remember you

34

can consider conduct after." Appellant is technically correct that there is no law forbidding "complicity after the fact." Furthermore, "accessory after the fact" is not a crime in Ohio. We, however, do not read the prosecutor's observations to suggest appellant's actions after the murder require either potentially problematic interpretation. Rather, we view the prosecutor's statements as legitimate directives for considering the evidence vis-à-vis appellant's charges as a complicitor.

{¶149} The prosecutor's statements direct the jury to simply look at appellant's behavior both before *and after* the murder. The prosecutor was simply advising the jury that the entire context of appellant's acts and/or omissions, both before and after the incident, must inform their deliberations on his guilt or innocence. Nothing in the prosecutor's statement indicates that "complicity after the fact" is a crime unto itself or that appellant should be viewed guilty of murder as an accessory after the fact. It is well settled that a defendant's conduct before and after a crime is relevant to whether he was an aider or abettor under a complicity theory of criminal culpability. *See e.g. State v. Drummond*, 11th Dist. Ashtabula No. 2013-A-0055, 2015-Ohio-939, ¶53. We therefore discern nothing inherently improper in the prosecutor's comments.

{¶150} Next, appellant asserts the prosecutor improperly commented on the evidence when she suggested the marks on the vehicle's ceiling were hammer marks. He maintains that because there was no evidence of what caused the marks, drawing the connection was misconduct. We do not agree.

{¶151} During closing, the prosecutor did not specifically assert the marks were from a hammer or that appellant made the marks with the hammer. To the contrary, the prosecutor actually explained that there was no evidence establishing the marks were

made with a hammer; hence, the prosecutor noted, in light of all the evidence, that issue was a matter for the jury to decide. The prosecutor identified the evidence and directed the jury to consider where the marks were made, the direction of the marks, and the location of Putzbach's head during the attack. The prosecutor's statements, under the circumstances, were not improper.

{¶152} Finally, appellant argues the state misstated the law of complicity when it said that appellant need only have acted "knowingly" with regard to the mens rea required for complicity when, in fact, the jury was required to find appellant acted "purposely." We previously addressed this issue under appellant's eighth assignment of error. In that analysis, we concluded that because the trial court assigned the proper mens rea to the crime of murder in its jury charge and the complicity instruction was accurate, the prosecutor's remark did not affect appellant's substantial rights.

{¶153} Appellant's thirteenth assignment of error lacks merit.

{¶154} For ease of discussion, we shall next address assignments one through four together. They provide:

{¶155} "[1.] The trial court erred by failing to grant a judgment of acquittal pursuant to Crim.R. 29(A), on the charge of murder, and thereafter entering a judgment of conviction of that offense which was not supported by sufficient evidence, in derogation of appellant's right to due process of law as protected by the Fourteenth Amendment to the United States Constitution.

{¶156} "[2.] The trial court erred by entering a judgment entry of conviction of murder that was against the manifest weight of the evidence, in derogation of

36

appellant's right to due process of law, as protected by the Fourteenth Amendment to the United States Constitution.

{¶157} "[3.] The trial court erred by failing to grant a judgment of acquittal pursuant to Crim.R. 29(A), on the charge of gross abuse of a corpse, and thereafter entering a judgment of conviction of that offense which was not supported by sufficient evidence, in derogation of appellant's right to due process of law, as protected by the Fourteenth Amendment to the United States Constitution.

{¶158} "[4.] The trial court erred by entering a judgment of conviction of gross abuse of a corpse that was against the manifest weight of the evidence, in derogation of appellant's right to due process of law, as protected by the Fourteenth Amendment to the United States Constitution."

{¶159} A "sufficiency" argument raises a question of law as to whether the prosecution offered some evidence concerning each element of the charged offense. *State v. Windle*, 11th Dist. Lake No. 2010-L-0033, 2011-Ohio-4171, ¶25. "[T]he proper inquiry is, after viewing the evidence most favorably to the prosecution, whether the jury could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Troisi* 179 Ohio App.3d 326, 2008-Ohio-6062, ¶9 (11th Dist.).

{¶160} In contrast, a court reviewing the manifest weight observes the entire record, weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Schlee*, 11th Dist. Lake No. 93-L-082, 1994 Ohio App. LEXIS 5862, *14-*15 (Dec. 23, 1994).

**{¶161}** Appellant was convicted of murder, in violation of R.C. 2903.02(A). That section provides that "[n]o person shall purposely cause the death of another * * *." "A person acts purposely when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature."

**{¶162}** Appellant was also convicted of gross abuse of a corpse, in violation of R.C. 2927.01(B). That statute provides: "No person, except as authorized by law, shall treat a human corpse in a way that would outrage reasonable community sensibilities."

**{¶163}** Because it was undisputed that Basinger was the individual who facilitated the attack, appellant's murder conviction was premised upon the theory that he was complicit with Basinger and Shirer in Putzbach's murder, i.e., that he aided or abetted in the crime. In order to support a conviction premised upon an individual's complicity through aiding or abetting, "the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal." (Emphasis added.) *State v. Johnson*, 93 Ohio St.3d 240, 245 (2001). Mere presence of an individual at the scene of the crime is insufficient to prove that he or she was an accomplice. *Id.* at 243-245. Aiding and abetting may be established, however, by either direct or circumstantial evidence, and it can be inferred from "presence, companionship and conduct before and after the offense is committed." *Id.*

**{¶164}** The state's theory of appellant's guilt is premised, for the most part, upon circumstantial evidence. The state notes how appellant's story gradually changed

38

during his interview with police. Initially, appellant told officers he was not present when the murder took place; eventually, after lengthy questioning, however, appellant admitted he was present when the attack took place. Even though appellant steadfastly denied any involvement in the assault and eventual murder, the state asserts appellant's protestations of innocence lack credibility in light of the false story he initially gave police.

{¶165} The state further notes that appellant's involvement in the attack can be inferred from the actual circumstances surrounding the crime. Basinger and Shirer were at appellant's apartment together hours before the attack; and, in the state's view, appellant inexplicably accompanied Basinger, who had a roll of duct tape around his arm, and Shirer to the marijuana buy. And, once Putzbach arrived, the three men, for no obvious reason, entered Putzbach's vehicle. The state maintains these facts support the inference that the three men were collectively aware and complicit in the plan to assault, rob, and/or murder Putzbach.

{¶166} The state also emphasizes that the hammer used to bludgeon Putzbach belonged to appellant. When it was found by police, it had been cleaned; nevertheless, Dr. LaBonne testified that a mixture of appellant's and Putzbach's DNA was found on the head of the hammer. Furthermore, notwithstanding appellant's denial of any participation in the crime, the state points out there were indentations on the vehicle's rear-passenger side ceiling, which appeared to match the parallel edges of a hammer. And the state's expert, Choya Hawn, opined, based upon crime scene evidence and information from the medical examiner, that the individual wielding the hammer was

more likely than not seated in the rear-passenger compartment of the vehicle; the seat appellant admittedly occupied.

{¶167} After the murder, the state notes appellant did not return to his apartment; instead, he left the back seat of the vehicle, entered the front seat, and left the complex with Basinger. They traveled to a local metropark where, appellant claimed Basinger single-handedly discarded various items, including a jack, and placed Putzbach's body in the trunk of the vehicle. Appellant denied assisting Basinger with any of these activities; in fact, appellant maintained he remained in the vehicle the entire time. The state points out, however, appellant would have no knowledge of what was removed from the vehicle if he remained in the vehicle. Moreover, the state postulates the movement of a six-foot tall, 130-pound body would require more than one man.

{¶168} The state further points out that appellant knew of Basinger's whereabouts after the murder, and was aware he was using Putzbach's vehicle. The state also underscores that appellant did not contact police after the incident or express any obvious remorse during his interview. It maintains this further demonstrates that appellant was involved as his initial silence and purported lack of concern permits the reasonable inference that he was complicit in the crimes of which he was convicted.

{¶169} With respect to sufficiency, the state must produce *some evidence* on each element of the crime of complicity to murder. The ceiling marks and Hawn's testimony involve the only evidence potentially implicating appellant as the individual who struck Putzbach with the hammer. During his interrogation, however, there is some indication that appellant implicated himself in the restraint of Putzbach. Near the end of their questioning, officers asked appellant to recount the details of the attack. According

40

to appellant, Basinger loosened the chain with which he was choking Putzbach, and grabbed the hammer hand. Appellant then stated Basinger began beating Putzbach with the hammer. While reiterating this account, however, appellee contends appellant made the following statement: "[Basinger] took [the hammer] out of his pocket, and then *we* had pulled the dude back, he like reached down and picked [the hammer] up."

{¶170} The foregoing statement would ostensibly implicate appellant in the attack *if* he indeed used the pronoun "we." And transcript of the interrogation indicates appellant used the word "we." As discussed above, however, a careful review of the interrogation video demonstrates that he may have used the pronoun "he," referring to Basinger. The words appellant employs are not clearly enunciated; rather, they are pronounced quickly and run together. It is therefore not entirely obvious whether appellant, consistent with his denial of involvement and inculpation of Basinger, actually stated: "[Basinger] took [the hammer] out of his pocket, and then *when he* had pulled the dude back, he like reached down and picked [the hammer] up." This ambiguity in translation is obviously troubling.

{¶171} We are required, however, to view the foregoing evidence in a light most favorable to the prosecution. In this respect, we must construe appellant's statement, regardless of what he actually said, as a suggestion of his active involvement in the restraint of Putzbach. Construing the statement as such, appellant, even if he did not mean what he said, implicated himself in the murder. Given our standard of review on sufficiency, we are forced to conclude the state met its burden of production.

{¶172} Appellant's first assignment of error lacks merit.

41

{¶173} With regard to the conviction for gross abuse of a corpse, however, we find the state failed to produce sufficient evidence to overcome appellant's Crim.R. 29 motion.

{¶174} There was no testimony or other evidence that appellant ever touched Putzbach's body after the murder was complete. To the contrary, both appellant and Basinger testified appellant was *not* involved in the movement of the body from the vehicle's back seat into the trunk. The state argues that appellant must have assisted Basinger because it is incredible to think one man could lift a six-foot tall, 130-pound dead body and carry it, by himself, to the vehicle's trunk. In support, the state notes that blood-spatter analyst, Curtiss Jones, who helped remove the body, required assistance from others. Jones' inability to remove the body without assistance, however, has no bearing on whether Basinger possessed the wherewithal to remove the same without assistance. Other than the state's speculation that the feat of removing the body would be impossible without assistance, there was no probative evidence indicating Basinger was incapable of lifting the body on his own. Even viewing the evidence in the state's favor, there was insufficient evidence to support the conviction for gross abuse of a corpse.

{¶175} Appellant's third assignment of error has merit, thereby rendering his fourth assignment of error moot.

{¶176} Notwithstanding our conclusion relating to sufficiency, to obtain a murder conviction, the state also had to meet its burden of persuasion. To achieve this goal, the evidence in this matter required the jury to conclude that appellant, purposefully, either helped restrain Putzbach, appellant struck Putzbach with the hammer, or both.

42

There was no unequivocal direct evidence, however, that appellant was involved in any aspect of the attack. And the state's circumstantial evidence is not as persuasively powerful as it would have this court believe.

{¶177} While appellant's story changed during the interview, he told his interrogators he feared he would be held guilty by association if he revealed he was a witness to the murder. Because, appellant claimed, he had no idea that Basinger intended on attacking Putzbach and was in great shock when it occurred, he wanted to distance himself from the crime as much as possible. In light of these points, the credibility of appellant's continuous denial of any involvement in the incident is not as dubious as the state asserts.

{¶178} Moreover, the facts that the three men were at appellant's apartment before the attack; walked down to the parking lot as a group, with Basinger openly carrying a roll of duct tape, before the attack; and collectively climbed into Putzbach's vehicle does not provide a strong circumstantial basis for the inference that appellant had foreknowledge of and aided in the commission of the attack. Appellant repeatedly stated he and Shirer went with Basinger to purchase the marijuana because they desired to see what they were purchasing. Basinger echoed this explanation and further noted that appellant was the individual with money to buy the marijuana.

{¶179} Further, the fact that Basinger had a roll of duct tape around his wrist, under any ordinary circumstance, would not put a reasonable person on notice that the individual donning the tape intended on committing a crime. Again, viewed in the context of appellant's protestations of innocence as well as Basinger's testimony that appellant was not involved in the crime in any way, the foregoing circumstances offer

little in the way of establishing appellant helped plan or otherwise knew the attack was going to occur.

{¶180} Also, Basinger testified that, prior to Putzbach's arrival, appellant and Shirer were playing video games. Basinger testified, at some point, he took the hammer from appellant's closet. There was no evidence presented, however, that appellant or Shirer witnessed Basinger take the hammer. And Basinger testified the only discussion he recalled the men having relating to Putzbach's arrival was their plan to "[g]o down, meet [Putzbach], check out the bud, if it was nice we'd buy it."

{¶181} The state also stresses that appellant's representations that he had little to no blood on him after the murder is completely without credibility given the violent and bloody nature of the attack. Appellant and Basinger, however, each testified that appellant was cowering in the corner of the vehicle while Basinger bludgeoned Putzbach. This testimony, if believed, could support appellant's statement regarding the lack of blood on his person.

{¶182} Further, the fact that appellant's DNA was found on the head of the hammer is relatively inconsequential regarding whether he planned or participated in the incident as he was the owner of the tool and it was kept in his apartment. Moreover, Dr. Labonne testified he found no touch DNA on the handle of the hammer. It is also worth noting the doctor swabbed the chain for touch DNA, but found no profile. A pair of fingerless-leather gloves was found on top of the chain when it was discovered in the vehicle. And it was undisputed Basinger used the chain to strangle Putzbach.

{¶183} Moreover, appellant as well as Basinger testified appellant was cowering in the corner of the seat with Putzbach's head near him. Their account of the attack

44

could also explain why the blood spatter struck the rear passenger window in the manner it did, rather than being blocked by a person sitting in the rear-passenger seat.

{¶184} Notwithstanding appellant's and Basinger's testimony that Basinger wielded the hammer, the state emphasizes the indentations on the rear-passenger compartment's ceiling, in conjunction with Hawn's opinion that the person swinging the hammer was likely sitting in the rear-passenger seat, provides strong circumstantial evidence of appellant's involvement. Weighing the evidence pursuant to our standard, we conclude these points do little, if anything, to advance the state's position.

{¶185} First, neither Hawn nor any witness for the state, could confirm the marks on the ceiling were a result of a hammer. Moreover, Hawn admitted he only was provided with the state's theory of how the crime occurred and was not privy to appellant's defense or any alternative possibilities regarding the commission of the murder. Indeed, Hawn did not explore or analyze *any alternative theories* in the course of his evaluation. Instead, he placed the hammer in the hand of the individual in the rear-passenger compartment and attempted to determine whether that person could have beaten Putzbach and, if so, how that scenario would have played out. A review of Hawn's presentation, which was sent to the jury room for deliberations, demonstrates, however, that his rendering of the position of the victim at the time of the assault with the hammer does not match the evidence adduced at trial. Because this rendering was necessary to support his conclusion, his ultimate conclusion is highly problematic.

{¶186} Hawn's graphic presentation places Putzbach almost entirely in the driver's seat with his hands in his lap. Both appellant *and* Basinger testified Putzbach was at least halfway in the backseat when Basinger struck him with the hammer. And

45

appellant, as well as Basinger, noted Putzbach's head was nearly on appellant's lap when he bludgeoned him with the hammer.

{¶187} Furthermore, Curtiss Jones specifically stated the shape of the blood spatter on the window indicated the victim's head was approximately 90 degrees perpendicular to the rear-passenger window when it was struck. Hawn's graphic presentation depicts the victim's head barely in the back-seat area and identifies the trajectory of the blood at angles *significantly* greater than the 90 degree mark to which Jones' testified.

{¶188} In light of the foregoing points, Hawn's conclusion and graphic presentation, that the individual in the rear-passenger compartment more likely than not swung the hammer, necessarily relied upon an erroneous placement of the victim's body at the time of the beating. Hawn's testimony, in light of its inaccurate foundation, does nothing to fill in the evidential gaps of this truly troubling case. In short, Hawn's conclusion, viewing the evidence in its entirety, is simply not credible.

{¶189} Human liberty must not be forfeited by a conviction under evidence that merely establishes a defendant was present at a crime scene. Such evidence is inadequate, measured by fairness and reason, to convince an impartial mind of the guilt of an accused beyond a reasonable doubt. This is especially true where life imprisonment is the punishment implemented.

{¶190} The evidence certainly establishes appellant was in the vehicle, located in the rear-passenger seat. While both parties have diametrically opposing interpretations of a crucial statement made by appellant during the interrogation, neither is persuasively dispositive. And no expert testimony, in the form of an audio technician or the like, was

offered to potentially clarify this disturbing and pivotal confusion. Still, it remains that appellant did and still does stridently deny any involvement and, in his first trial, the state did not present any testimonial evidence that appellant inculpated himself via the statement in question. Only on retrial did Parmertor indicate he heard appellant implicate himself and, the officer stressed on retrial, that he believed, all along, appellant's statement was a confession. The lack of such crucial testimony in appellant's first trial is significant.

{¶191} On the other hand, Basinger's testimony fully cleared appellant from involvement. And, even though Basinger and appellant had not spoken since the incident, Basinger's version of events mirrored appellant's rendition, not the least of which was appellant's complete and total denial of any involvement in a plan or act to rob or harm Putzbach. We recognize that Basinger originally identified appellant as the individual wielding the hammer. Basinger explained at trial, however, he implicated appellant for selfish reasons, in effect, as a vendetta for speaking with police. This explanation is not only reasonable, but consistent with the position appellant has taken from the inception of his questioning.

{¶192} The weight of the evidence and the credibility of witnesses is ordinarily a matter exclusively in the province of the jury to resolve, and, as a general rule, a reviewing court will not reverse a judgment premised upon a verdict approved by both jury and trial judge. This is especially the case where there is substantial evidence to support that verdict. It is also a rule that the evidence relied upon must be of a *substantial character*. *See Tibbs v. State*, 337 So.2d 788, 791 (1976), citing *McNeil v. State*, 104 Fla. 360, 362 (1932), reversal upheld by *Tibbs v. Florida*, 457 U.S. 31 (1982).

47

When evidence is not substantial in character, a reviewing court must also be committed to a rule that a conviction will be reversed and a new trial ordered. Sitting as the proverbial "thirteenth juror," to hang the "jury of thirteen" where the evidence, in its entirety, militates against conviction.

{¶193} In Ohio, "proof beyond a reasonable doubt is proof of such a character that an ordinary person would be willing to rely and act upon it in the most important of [the person's] own affairs." R.C. 2901.05(E). Although the evidence in this case may be technically sufficient to support a conviction, that evidence is, sadly, viewed in its totality, a product of much guesswork and suspicion. The quality and character of the state's evidentiary tableau is not such that a reasonable person would rely upon it as he or she would rely and act upon evidence to execute his or her most important personal affairs. Accordingly, rather than risk the very real potential that appellant had nothing to do with Putzbach's tragic death, we must reverse the murder conviction as against the manifest weight of the evidence and remand the matter for a new trial.

{¶194} Appellant's second assignment of error has merit.

{¶195} Because a three-judge unanimous conclusion reversing a jury verdict on a manifest weight challenge is necessary to order a new trial, we shall continue our analysis by considering appellant's fifth assignment of error. It asserts:

{¶196} "The trial court erred in qualifying Choya Hawn as an expert in the area of crime scene reconstruction, in accepting his testimony as relevant, in determining that even if relevant, the probative value outweighed the danger of unfair prejudice, and deciding that the state had met its burden of establishing every requirement of Evid.R. 702."

48

**{¶197}** "A determination as to the admissibility of an expert's testimony is a matter that is generally within the discretion of a trial judge and will not be disturbed absent an abuse of discretion; however, that discretion is not unlimited." *Slaby v. Boyle* 11th Dist. Ashtabula No. 97-A-0086, 1999 Ohio App. LEXIS 2807, *9 (June 18, 1999), citing *Miller v. Bike Athletic Co.*, 80 Ohio St.3d 607, 616 (1998).

**{¶198}** "Relevant evidence is 'evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" *State v. DeRose,* 11th Dist. Lake No. 2000-L-076, 2002-Ohio-4357, ¶15, quoting Evid.R. 401. Even where evidence is relevant, however, it is inadmissible "if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Evid.R. 403(A).

**{¶199}** Pursuant to Evid.R. 702, a witness may testify as an expert if:

**{¶200}** (A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;

**{¶201}** (B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;

**{¶202}** (C) The witness' testimony is based on reliable scientific, technical, or other specialized information. To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:

**{¶203}** (1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted *knowledge, facts, or principles*;

**{¶204}** (2) The design of the procedure, test, or experiment reliably implements the theory;

**{¶205}** (3) The particular procedure, test, or experiment was conducted in a way that will yield an *accurate result*. (Emphasis added.)

**{¶206}** Accordingly, if the record demonstrates that the subject of the expert's testimony pertains to matters beyond the knowledge or experience of lay persons; that the expert has specialized skills or knowledge to assess the facts not generally possessed by lay persons; and that the witness' testimony is premised upon reliable, scientific, or technical information, the expert's opinion testimony is admissible, so long as it is relevant and its probative value is not substantially outweighed by the risk of unfair prejudice, confusion of issues, or misleading the fact finder.

**{¶207}** After a *Daubert* hearing, the trial court determined Hawn could testify as an expert. The court specifically stated:

> **{¶208}** The court concludes that Hawn is qualified as an expert by specialized knowledge, skill, experience, training and education and that his exhibits are based on reliable scientific, technical and other specialized information. He is particularly well qualified to create crash and crime scene depictions and the software he used is derived from widely known scientific principles and technical knowledge. His three dimensional digital depiction of the crime scene will be useful in helping the jury determine the position of the victim and the assailant(s) at the time of the crime. The court cannot conclude at this point that his testimony will not be properly grounded and well reasoned. Any irregularities or error in the scaling and placement of items or persons in the depiction go to the weight rather than the admissibility of the evidence and the defense will have an opportunity to challenge the grounds upon which he created his depiction.

**{¶209}** We conclude the trial court did not abuse its discretion in qualifying Hawn as an expert.

**{¶210}** First, reconstruction of a to-scale crime scene, with the assistance of a sophisticated, computer-aided-design program, and evidence taken by law enforcement as well as the report of the medical examiner, represents information or facts beyond

the ken and experience of the jury. While the jury had an opportunity to view the actual vehicle in which the assault occurred, Hawn's reconstruction provided a scaled, three-dimensional static image of the relative positions of all four occupants during the attack. These images, although not necessarily an exact rendition of the actual crime scene, represent information outside the average juror's knowledge and experience. And the images were used to assist the jury in understanding the placement of the individuals as before and during the attack.

{¶211} Further, Hawn's credentials as an expert in accident reconstruction were thoroughly established. With respect to this point, the trial court found:

{¶212} Hawn has an extensive background in law enforcement. He has associate degrees from Terra Community College in Fremont, Ohio in both Law Enforcement and Police Administration. He was commissioned as a trooper in the Ohio State Highway Patrol where he served twenty-six years as a field trooper and crash investigator. While in the Ohio State Highway Patrol, he was frequently called upon to investigate or assist other investigators in serious and complicated crashes in Ohio. He also investigated crimes on turnpike property. For the past eighteen years, Hawn has worked as a certified police basic instructor at the Ohio Peace Officer Training Academy. He completed post graduate and technical crash investigation training from the Ohio State Highway Patrol, from the University of North Florida and from the Collision Safety Institute. He has also received training in crash investigation and incident reconstruction from Introtech using the ARAS-369 drawing, animation and simulation program. He has been accredited as an accident investigator and reconstructionist since 2005 by ACTAR (Accreditation Commission for Traffic Accident Reconstruction).

{¶213} The foregoing demonstrates Hawn's specialized skills or knowledge to process and assess the three-dimensional visual aid depicting the crime scene. Such skills are not generally possessed by lay persons.

{¶214} Finally, the court determined the testimony Hawn would offer would be based upon reliable technical methods. The court found:

51

**{¶215}** Hawn testified that he created an interior and exterior three dimensional digital depiction of the victim's car. He used the software to draw in a background and downloaded a model of the car that was available in the software maker's database. This model came with a listing of the car's various dimensions. He also downloaded representative models of the individuals involved. While the models do not depict the individuals themselves, they are very close in scale to the actual height and weight of the persons. Because the victim was unusually tall but thin, the model depicted him as being 170 pounds in weight instead of his correct weight of 130 pounds. Hawn testified that this did not compromise the crime scene depiction. The crime scene depiction can be rotated on the x, y and z axis and can be expanded or contracted while maintaining correct scale. Hawn then inserted the tool marks and blood spatters in the model. Hawn testified that the ARAS 360 HD software is accepted and well regarded for crash and crime scene reconstruction and no evidence was presented otherwise. The ARAS 360 HD software is essentially a modified computer aided design software program. Computer aided design software [has] been in use by engineering and graphics designers for over twenty years. Hawn testified that others can readily recreate his results using this or similar software.

**{¶216}** Although the trial court could not specifically conclude, at the time of the *Daubert* hearing, that Hawn's opinions would be properly grounded or well-reasoned, it determined, given the general reliability of the tools and technical methodology employed by Hawn, this did not render Hawn's testimony inadmissible. Instead, the court found that the validity and ultimate weight of Hawn's opinions could be thoroughly tested on cross examination at trial. The trial court's conclusion was reasonable under the circumstances.

**{¶217}** At trial, Hawn opined that the individual with the hammer was more likely than not in the rear passenger seat. He admitted this conclusion was based upon the evidence disclosed to him by the prosecutor's office. His three-dimensional renderings were derived from this evidence, the spatial limitations of the vehicle, and his training in biomechanics and as an accident reconstructionist. As discussed above, however, a

52

review of his presentation demonstrates his rendering of the placement of the victim at the time of the bludgeoning neither matched the eye-witness testimony nor the testimony of blood-spatter analyst, Curtiss Jones.

{¶218} Both appellant and Basinger testified that Putzbach was partially in the backseat compartment with his head nearly on appellant's lap at the time the bludgeoning took place. Basinger stated Putzbach was "in the backseat halfway," with his head "almost in [appellant's] lap" when the beating took place. And appellant stated that, prior to the beating, Putzbach was almost on top of him and his arms were flailing such that they may have struck him.

{¶219} Hawn's three-dimensional drawing of the crime scene at the time of the beating is completely different from the foregoing testimony. The drawing depicts the victim's body almost entirely in the front-driver's seat, with his arms positioned on or near his lap, and his head only slightly pulled into the rear compartment. In short, the position of the victim's body in Hawn's drawing does not represent a de minimus deviation from the eye-witness testimony, it *significantly* differs.

{¶220} Hawn also testified that the depiction accounted for the approximate angle at which the blood spattered on the window; according to Jones, however, the blood spatter was at or near a 90-degree angle perpendicular to the window. Jones specifically testified that the circular or slightly oval shape of the stains on the window "indicate approximately a perpendicular angle path in the area of 90 degrees or so." The angles of the spatter in Hawn's depiction do not appear even close to a 90-degree perpendicular trajectory; instead, the drawing shows roughly a 110-degree and 130-degree angles of spatter, respectively.

**{¶221}** Moreover, Jones testified that the back area of the front passenger seat had what appeared to be a "transfer type stain." The only impact spatter described by Jones appeared "on the interior of the rear passenger door and window." If, as Hawn's graphic presentation indicates, Putzbach's head was only partially tilted into the rear compartment, at or about a 90-degree angle perpendicular to the window, then blood spatter would have been present on the side or back of the front-passenger seat as well. There was no testimony or evidence to support this scenario.

**{¶222}** Hawn's depictions in the presentation would not be necessarily problematic if he provided some basis for rendering the victim in the position he depicted. At trial, however, no such basis was given. Instead, Hawn testified his depiction of the four occupants of the car at the time of the beating was based upon their positions in the vehicle *as they were presented to him*. Defense counsel objected to this, but the objection was overruled without discussion.

**{¶223}** Hawn ultimately concluded that, considering "*the positioning and orientation of the victim*, *the blood evidence*, whether or not the marks on the headliner are or are not part of the physical evidence inside of the vehicle, the dimensions that are available to swing the weapon and cause the severity of the injuries that are seen, the most likely scenario is that all of those things lead to the person sitting in the right rear seat." (Emphasis added.)

**{¶224}** The positioning and orientation of the victim, as depicted in Hawn's presentation, necessarily affected his expert opinion. The positioning and orientation of the victim depicted in the presentation, however, are not consistent with the eye-witness testimony or Jones' blood-spatter testimony. And there was no additional evidence

54

presented that would reasonably refute appellant's, Basinger's, or Jones' testimony or allow for a competing inference to support Hawn's rendering.

{¶225} Moreover, Hawn inappropriately commented on the force or strength necessary to inflict the injuries to Putzbach.  On direct, Hawn observed that the individual causing the injuries inflicted by the hammer "obviously, was trying to make them severe."  Defense counsel objected and the objection was sustained.  In a follow-up question, the prosecutor clarified that Hawn was not being asked about the attacker's state of mind, but, instead, about the biomechanics involved given the small compartment of the vehicle.  As such, Hawn opined that to create the wounds, the attacker had to likely use all the available space inside the rear compartment of the vehicle.

{¶226} Hawn possessed no information relating to the force required to inflict the injuries. The prosecutor's qualification of the follow-up question does not change this point.  And Hawn's opinion that the attacker had to use the entirety of the available space to inflict the injuries is both unremarkable and, in effect, established nothing. Given the inaccuracies in Hawn's graphic presentation, and regardless of the available space in the rear compartment of the vehicle, we are left with the conclusion that *either individual* in the rear compartment could have struck Putzbach with the hammer. Accordingly, Hawn's conclusion that appellant more likely than not swung the hammer is simply self-fulfilling:  He was provided with the state's theory and worked backwards, irrespective of crucial record evidence, to arrive at a depiction that biomechanically supported his conclusion.

{¶227} Moreover, it is worth pointing out that, in his presentation, Hawn depicted *only* the individual in the rear-passenger seat with a hammer and, notably, several slides depict that individual actually striking the victim with the hammer. Hawn testified that he placed the hammer in the hand of the individual in the rear-passenger seat to determine whether, given the space in the vehicle and human biomechanics, that individual could have wielded the hammer. Hawn, however, did not evaluate whether the individual in the rear-driver's-side seat could have similarly swung the implement.

{¶228} Hawn's ultimate opinion, that the person wielding the hammer was more likely than not in the rear passenger seat, was premised upon his rendering of the victim; that rendering, however, was premised upon seemingly arbitrary details which were not supported by the evidence. These problems were further compounded by the publication of Hawn's Power Point presentation to the jury for its deliberations. As Hawn admitted on cross-examination, if any of the information he used to conduct his analysis was incorrect, then his conclusion would be incorrect: "garbage in, garbage out." Because Hawn's depiction of the victim's orientation and position is not supported by the evidence, it was ill-founded, unreliable, and therefore irrelevant. And, even assuming arguendo, Hawn's testimony could be deemed marginally relevant, to the extent it provided the jury with some spatial reference regarding where the occupants of the car were situated, any coincidental relevance was *substantially* outweighed by its unfair prejudice and the probability that it misled the jury. We therefore hold admitting Hawn's testimony was reversible error.

{¶229} Appellant's fifth assignment of error has merit.

56

{¶230} Although appellant's fifth assignment of error is dispositive of this matter, we shall address appellant's fifteenth assignment of error as it is capable of repetition in any potential future proceedings. It provides:

{¶231} "The trial court engaged in prejudicial error when it provided a transcript, complete with the court reporter's certification of appellant's interrogation to the jury contemporaneously with its playing, despite absolute disagreement between the parties as to the most material portion of the recording, which deprived appellant of due process and a fair trial."

{¶232} Under this assigned error, appellant contends the trial court abused its discretion when it provided a copy of the transcript of appellant's interrogation, with the reporter's certification. He notes the parties vehemently disagreed over whether, during the interrogation, appellant stated "when we pulled him back," as the state argued, or "when he had pulled him back," which was appellant's position. The certified transcript, however, read "we had pulled him back." Hence, appellant maintains, the transcript improperly bolstered the state's position resulting in unfair prejudice to his defense.

{¶233} Prior to Patrolman Broadwater testifying, counsel for both parties discussed the use of the subject transcript with the trial court. Defense counsel argued that by providing the jury with the written transcript, the panel members would believe what was in print, rather than independently interpret the interview. The trial court noted counsel's concern and explained it would provide an instruction that the transcript was not evidence and if there are any conflicts between the video and the transcript, they must resolve the conflict based upon the evidence presented. Moreover, the court noted defense counsel could highlight the issue during cross-examination and in closing.

Counsel did not press the issue further. The court subsequently issued the following instruction to the jury:

{¶234} Ladies and gentlemen, you are going to watch and hear this video tape recording. A transcript, a written transcript of that recording is being provided to you as a listening aid to help you to follow the recording. Now, I need to be very clear that the evidence itself consists only of the recording, not this transcript that's being given to you. The transcript is not the evidence, but it is provided to you only for the purpose of helping to understand the recording, if you find that the transcript, in fact, does help you. If you find that there is a difference or a discrepancy between the transcript and the recording, you are to rely only on the recording. Do not let reading the transcript distract you from listening to the audio and the video. Your main focus and attention must be on this video tape recording. Now, the attorneys may or may not disagree whether there is any difference or discrepancy between the transcript and the recording, you should disregard the transcript and use your own judgment as to what was said. So again I emphasize, the recording itself is the evidence. The transcript is just being given to you as an aid. It's not the evidence.

{¶235} The video was played during Patrolman Broadwater's testimony and a copy of the transcript was given to each panel member. Broadwater's testimony continued into the following day and, at the beginning of his testimony, the court advised the jury that the video would be played again and the panel members would have copies of the transcripts. The court again admonished the jury that the transcripts were only aids to the interrogation video itself. The court further reminded the jury that the video was evidence, not the transcript. Finally, the court again reiterated the point during its jury charge, stating:

{¶236} A transcript of a video recording was provided to you as a listening aid to help you in following the video recording. The evidence consists of the video recording only. The transcript is not evidence, but was provided to you only for the purpose of helping you understand the video recording, if you find that the transcript helps you. If you find there is a difference or discrepancy between the

58

transcript and the video recording, you are to rely only on the video recording and your own judgment as to what was said.

**{¶237}** The jury heard the video and later heard the testimony of Detective Parmertor. During Parmertor's testimony, he offered his opinion that appellant stated during the interview "we had pulled him back," indicating that appellant and Basinger pulled Putzbach into the rear compartment of the vehicle. Parmertor, however, was vigorously cross-examined on his interpretation. Defense counsel emphasized that Parmertor's interpretation, which was the interpretation of the reporter in the transcript, was not conclusive. Instead, counsel underscored, if one listens closely, one could also interpret appellant's statement to say "when he had pulled him back." Finally, defense counsel zealously highlighted the ambiguity during cross-examination and further stressed that it would make no sense for appellant to absolutely deny involvement for the entirety of the interview, only to implicate himself in a passing iteration of the manner in which Basinger dragged Putzbach into the rear compartment of the vehicle.

**{¶238}** Notwithstanding the court's cautionary instruction as well as the effectiveness of counsel's emphatic cross-examination, there was still a material question regarding accuracy of the transcript. This question was so pivotal that, arguably, the state's entire case rested upon the manner in which the jury resolved it. The written transcript reflected the state's interpretation and, apparently, given the result of the prosecution, the jury accepted this interpretation.

**{¶239}** The Supreme Court of Ohio has held that "[w]here there are *no 'material differences'* between a tape admitted into evidence and a transcript given to the jury as a listening aid, there is no prejudicial error." (Emphasis added.) *State v. Waddy*, 63 Ohio St.3d 424, 445 (1992), quoting *State v. Holmes*, 36 Ohio App.3d 44, 50 (1987). It is

59

beyond cavil that the accuracy of the transcript was in question. And, given this problem, there was a patent, material difference between the transcript and the alternative, competing interpretation of the content of appellant's statement. Given this disagreement, we hold the trial court erred to appellant's prejudice in allowing the transcript of appellant's interview to be used by the jury as a listening aid.

{¶240} We preliminarily note that certain federal courts have adopted an approach in which the use of a transcript as a listening aid is permissible only to the extent its accuracy is not questioned. *See United States v. Smith*, 537 F.2d 862, 863-864 (6th Cir.); *United States v. Turner*, 528 F.2d 143, 167 (9th Cir. 1975); *United States v. Bryant*, 480 F.2d 785, 791 (2nd Cir. 1973). This approach, which is subject to a harmless error analysis, is eminently reasonable because it preserves a defendant's right to have the jury make its factual determinations free of the potentially pernicious influence of a "secondary source." In this matter, not only was the accuracy aggressively challenged, defense counsel's competing interpretation of the statement was reasonable and consistent with appellant's regular denial of involvement throughout the interview.

{¶241} Furthermore, while the transcript was not admitted as evidence, we agree with appellant that the import of the written word cannot be overly stressed, especially in light of the emphasis the prosecution placed upon it. The written word in this case was a product of the court reporter's interpretation. We cannot say that one interpretation was purposely selected over another, only that an interpretation reduced to writing carries with it a significance that cannot be diminished, even via judicial admonishment.

{¶242} Even though the jury was directed to weigh the evidence independently and treat the transcript as nothing more than an assistive device, it is not difficult to see how a juror would be influenced, perhaps subconsciously, to select the written interpretation as *the* interpretation; just as one cannot un-ring the proverbial bell, one cannot discount the power of the written word to steer or shape a person's interpretation of a statement which, to the ear, is difficult to discern. And no matter how often a trial judge emphasizes that the recording, not the transcript, is the evidence, it is the written "aid" that will invariably inform the juror's interpretation when questions arise relating to the content of a recording. The printed word is invested with a certain power, "as in the well-known phrase, 'if it's in print, it's got to be true.' We all know that is not truly the case, but it nevertheless is a difficult urge to resist." *State v. Rogan*, 94 Ohio App.3d 140, 158 (2d Dist.1994).

{¶243} The transcript presented a third-party's decisive interpretation of appellant's statement. It not only endorsed the state's interpretation, but gave the impression that appellant unequivocally uttered "we had" rather than "when he had." A careful review of the interrogation demonstrates that appellant stuttered slightly and almost blended his words. This represents an additional peril of using the challenged transcription; namely, that the transcript could not capture or preserve the intonation, nuance, and cadence with which the statement was delivered. The jury was consequently not, out of necessity, compelled to give appellant's statement its own independent meaning. Instead, it was permitted to use the "listening aid" as a crutch on which it could intellectually lean if a statement was not aurally obvious.

{¶244} Finally, it bears noting that the transcript included a certification, certifying that the court reporter transcribed the interview "to the best of [her] ability." Although this would not be a problem where a transcript is stipulated accurate, the certification could represent an ostensible endorsement of the state's rendition of the evidence, despite the court's repeated admonitions.

{¶245} For the collective reasons discussed above, we hold the admission of the transcript, over defense counsel's objection, was prejudicial error.

{¶246} Appellant's ninth assignment of error has merit.

{¶247} Although appellant's fifth and ninth assignments of error are dispositive of this matter, we shall address appellant's fifteenth assignment of error, asserting cumulative error, in the interest of justice. It contends:

{¶248} "The cumulative effect of multiple errors at trial, even if singularly not sufficient to warrant reversal, together deprived appellant of a fair trial and a denial of due process."

{¶249} In *State v. DeMarco*, 31 Ohio St.3d 191 (1987), paragraph two of the syllabus, the Supreme Court of Ohio recognized the doctrine of cumulative error. Pursuant to this doctrine, "a conviction will be reversed where the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of *numerous instances of trial court error* does not individually constitute cause for reversal." *Id.* at paragraph two of the syllabus. In order to find "cumulative error," we first must find that multiple errors were committed at trial. *State v. Madrigal,* 87 Ohio St.3d 378, 398 (2000). "We then must find a reasonable probability that the outcome of

the trial would have been different but for the combination of the separately harmless errors." *State v. Hawthorne*, 7th Dist. Columbiana No. 04 CO 56, 2005-Ohio-6779, ¶46.

{¶250} In this case, we found various errors that, in isolation, did not rise to the level of plain error. Nevertheless, we hold the collective impact of these errors, in light of the tenuous evidence supporting the purposeful murder conviction, rise to the level of cumulative error.

{¶251} First, Patrolman Broadwater testified, on re-direct examination, to his opinion that appellant was lying during the interrogation because, according to the officer's belief, appellant used the hammer. This was an impermissible comment, by the officer, on appellant's credibility. By itself, and in light of defense counsel's overall cross-examination, it was not plain error. Nevertheless, the jury was never instructed to disregard the testimony. Further, on re-direct examination, Detective Parmertor testified that it was his "belief" that appellant assisted Basinger in the attack and murder. Parmertor's "belief" relating to appellant's guilt reflects his personal assessment of appellant's credibility. While, viewed independently, this statement does not rise to plain error, it was clearly impermissible.

{¶252} A witness may not express his or her belief or opinion regarding the credibility of another witness. *State v. Boston*, 46 Ohio St.3d 108, 128 (1989). Further, "[a] police officer's opinion that an accused is being untruthful is inadmissible." *State v. Withrow*, *supra*, ¶47, citing *State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, ¶122. *See also Root*, *supra*, at ¶31; *State v. Potter*, 8th Dist. Cuyahoga No. 81037, 2003-Ohio-1338, ¶39 (officer's testimony that defendant's version of events was untruthful was improper). Because "'jurors are likely to perceive police officers as expert witnesses,

63

especially when such officers are giving opinions about the present case based upon their perceived experiences with other cases,' an officer may not testify regarding the veracity of a witness' statement." *Root*, *supra*, quoting *Potter* at ¶38-39. In light of these points, Broadwater's and Parmertor's statements, viewed together, are particularly troubling.

{¶253} Moreover, even if we held the errors of admitting Hawn's testimony and publishing the transcript of appellant's interview to the jury were somehow not, unto themselves respectively, reversible error, these errors, in conjunction with the foregoing problems relating to the officers' testimony, would indubitably result in cumulative error.

{¶254} With the foregoing numerous errors considered collectively, we hold appellant's constitutional right to a fair trial was compromised. We therefore hold the doctrine of cumulative error additionally compels reversal of appellant's purposeful murder conviction.

{¶255} Appellant's fifteenth assignment of error has merit.

{¶256} Appellant's fourteenth assignment of error asserts:

{¶257} "Trial counsel failed to provide effective assistance of counsel, guaranteed by both the United States Constitution, and the Ohio Constitution."

{¶258} Given our disposition of appellant's second and fifteenth assignments of error, we need not reach appellant's arguments relating to counsel's alleged ineffectiveness.

{¶259} Appellant's fourteenth assignment of error is overruled as moot.

{¶260} For the reasons discussed in this opinion, appellant's second, third, and fifteenth assignments of error are sustained. All remaining assigned errors are without

merit.  The judgment of the Lake County Court of Common Pleas is accordingly vacated in part, reversed in part, and remanded for a new trial.

THOMAS R. WRIGHT, J., concurs,

DIANE V. GRENDELL, J., dissents with a Dissenting Opinion.

_____

DIANE V. GRENDELL, J., dissents with a Dissenting Opinion.

{¶261} I dissent from the majority's decision to reverse in part and vacate in part the judgment of the lower court and Brown's convictions for the senseless and brutal murder of William Putzbach.  Since this conclusion is based primarily on the majority's own opinions on the evidence presented at trial and serves to usurp the role of the jury, Brown's convictions must be affirmed.

{¶262} First, I disagree with the majority's conclusion that the Murder conviction was against the manifest weight of the evidence.  The State presented many pieces of evidence tying Brown to the murder.  Importantly, it must be emphasized that the majority's opinion essentially conducts a de novo review of the case, including the credibility of witnesses, to outline defects perceived in the State's case.  While this court is required to consider whether the jury "lost its way," the manner in which the majority appears to substitute its judgment for that of the jury serves to usurp its function and does not respect the jury's verdict.  "It is not the function of an appellate court to substitute its judgment for that of the factfinder."  *State v. Jenks*, 61 Ohio St.3d 259,

279, 574 N.E.2d 492 (1991). Several examples of this can be found when considering the evidence supporting the verdict against Brown.

{¶263} When the co-defendant, Basinger, exited the apartment building prior to meeting with the victim for a drug deal, he was accompanied by Brown and was carrying a roll of duct tape. A jury could reasonably infer that Brown either did know or should have known that more than a drug deal was about to happen. This is further supported by the fact that Basinger had both a hammer from Brown's apartment and a long chain in the vehicle just prior to the murder, other items that it would be difficult to say Brown would not have noticed prior to the occurrence of the murder.

{¶264} The majority contends that the roll of tape, viewed in the context of Brown's protestations of innocence, "offer[s] little in the way of establishing appellant helped plan or otherwise knew the attack was going to occur." *Supra* at ¶ 179. This is just one example of an area where the jury's verdict should be given deference. It is reasonable for the jurors to have concluded, in their experience, that the roll of tape showed knowledge of the attack, and they could have found it significant in light of other evidence of Brown's participation, given that individuals do not usually carry a roll of duct tape when going to meet someone.

{¶265} Additional evidence to support the conviction include the DNA evidence found on the hammer, mixed with the victim's, and also that the hammer was found in Brown's apartment. Even more significantly, marks were found on the ceiling near the passenger side of the vehicle where the attack occurred, in an area where Brown admitted to sitting, which resembled the edges of a claw hammer. Pictures of these marks were presented as evidence.

66

{¶266} The majority argues that the marks on the ceiling were not proven to be from a hammer. However, there was evidence before the jury allowing it to exercise its judgment to conclude that these marks were consistent with the use of a hammer by the individual who was undisputedly sitting in that area of the car. Most importantly, testimony was presented that the number of hammer marks was the same as the number of blows to the victim's head. This court's opinion should not be substituted for the jury's on this issue.

{¶267} The testimony regarding the blood spatter and reconstruction of the scene serve to further bolster the case that Brown was involved in the murder, regardless of his self-serving testimony denying involvement. The majority concludes that Basinger and Brown's "account of the attack could also explain why blood spatter struck the rear passenger window in the manner it did, rather than being blocked by a person sitting in the rear-passenger seat." *Supra* at ¶ 183. While this account "could" explain the evidence, the jury clearly decided this was not the case, especially given the facts supporting a determination of the witnesses' lack of credibility, with one having lied on the stand about Brown's involvement and the other being the defendant himself.

{¶268} The majority notes several times throughout its opinion that certain evidence, when considered in conjunction with or in light of Basinger's and Brown's testimony, lacks the weight necessary for a conviction. Again, the jury was certainly entitled to find that neither Basinger's nor Brown's testimony was credible. "When assessing witness credibility, the choice between credible witnesses and their conflicting testimony rests *solely* with the finder of fact * * * and [the appellate court] cannot substitute [its] judgment" for that of the trier of fact. (Emphasis added.) *State v.*

67

*Jaskiewicz*, 11th Dist. Trumbull No. 2012-T-0051, 2013-Ohio-4552, ¶ 22. If the jury chose to disbelieve them, none of the evidence need be evaluated in light of their testimony.

{¶269} This issue is also important in relation to the majority's claims that "the credibility of appellant's continuous denial of any involvement in the incident is not as dubious as the state asserts," based on his various justifications for his changing story, including fear of being found guilty of committing the crime. Essentially, the majority is stating that Brown's own justifications for his untruthfulness make him more credible. This is not only untenable, but impermissibly takes the credibility determination out of the hands of the jury.

{¶270} "[W]hen there are two conflicting versions of events, neither of which is unbelievable, we refrain from adjudicating which version we believe is most credible." *State v. Billingsley*, 7th Dist. Jefferson No. 15 JE 3, 2015-Ohio-4824, ¶ 18. It is not the role of this court to reach its own opinions about issues that can be interpreted in multiple ways.

{¶271} Under these circumstances, it would be improper to reverse the Murder conviction based on the weight of the evidence. "The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." (Citation omitted.) *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). This is not such a case. As the majority correctly points out, in light of this judge's dissent, reversal on this ground is not permissible. Ohio Constitution, Article IV, Section 3(B)(3).

{¶272} Given the foregoing, the majority also reviews other assignments of error that it finds warrant reversal. Primarily, the majority takes issue with Choya Hawn's testimony, finding that it did not match the testimony of the blood spatter analyst and that Hawn did not look at alternative theories. In advancing this position, the majority again relies on the testimony of two witnesses who have serious credibility issues, as discussed above. To find that Hawn's testimony was inconsistent with eye witness testimony is of little consequence if the jury found those witnesses lacked credibility.

{¶273} Further, that two experts differ somewhat in their explanation of the incident does not mean that their testimony was contradictory. Each had a different purpose and information in describing the incident. While it may not be possible to prove the exact position of Brown and the victim in the vehicle, this does not render Hawn's testimony of no value to the jury.

{¶274} The majority also reverses on the ground that it was prejudicial error to provide a transcript of Brown's interview with police to the jury when it contained a possible misstatement.

{¶275} While it may be true that the recording of Brown's interview is unclear as to whether he stated "we had pulled him [the victim] back" or "he [Basinger] pulled him back," while the transcript states "we," it is clear that the jury was entirely aware of this issue. It was raised on the cross-examination of Detective Parmertor, who explained that he believed Brown had said "we," despite defense counsel's questions implying that this was incorrect.

{¶276} The trial court specifically instructed the jury that the transcript was not evidence, explaining that, given any discrepancy, "you are to rely only on the video

69

recording and your own judgment as to what was said." The jury did not review the transcript without knowledge of a potential inconsistency with the video recording. "It is presumed that the jury will follow the instructions given to it by the judge." *State v. Loza*, 71 Ohio St.3d 61, 79, 641 N.E.2d 1082 (1994). It is not proper for this court to assume, based on no actual evidence, that the jury either could not or did not follow the instructions it was given by the trial court.

{¶277} Finally, as to the majority's reversal of the Gross Abuse of a Corpse conviction due to a lack of sufficient evidence, I also dissent. While the majority emphasizes that Basinger and Brown testified Brown did not move the victim's body, the jury was free to find that these witnesses lacked credibility. Here, the circumstantial evidence is more than sufficient to sustain a conviction. Testimony of another individual about the difficulty of one person moving the body is relevant, and the fact that the body was not dragged was supported by the lack of dirt or gravel found on the victim's clothing. There was also testimony and evidence to support the conclusion that Brown remained with Basinger and the vehicle after the murder and was aware of the items in the trunk where the body had been moved, lending credence to the fact that he was present and a participant.

{¶278} Since each of these issues reveal no error in the lower court, the argument that there was cumulative error lacks merit as well.

{¶279} For the foregoing reasons, there is no basis to second-guess the jury and reverse Brown's convictions. As such, I would affirm as to each assignment of error and uphold Brown's convictions in their entirety.